# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TIMOTHY SCALES,
    Plaintiff,

    vs.

COMMISSION ER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:19-cv-003

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Timothy Scales brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's application for disability insurance benefits (DIB). This matter is before the Court on

plaintiff's Statement of Errors (Doc. 6) and the Commissioner's response in opposition (Doc.

11).

## I. Procedural Background

Plaintiff filed his application for DIB in October 2014, alleging disability since January 3,

2011,[1] due to lung disease, emphysema, heart disease and depression.[2] The application was

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

a *de novo* hearing before administrative law judge (ALJ) Renita K. Bivins. Plaintiff and a

vocational expert (VE) appeared and testified at the ALJ hearing on December 7, 2017. On May

1, 2018, the ALJ issued a decision denying plaintiff's DIB application. This decision became the

---

[1] Plaintiff later amended his alleged disability onset date to July 29, 2014. (Tr. 71-72).

[2] Plaintiff filed a prior application for disability benefits in July 2012. This claim was denied after an ALJ
held a hearing and issued a decision dated July 28, 2014. (Tr. 108-24).

final decision of the Commissioner when the Appeals Council denied review on November 1, 2018.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security
> Act on March 31, 2017.
>
> 2. From July 29, 2014, the date of the [plaintiff]'s alleged onset date of his
> disability, through his date last insured [of] March 31, 2017, the [plaintiff] did
> not engage in substantial gainful activity (20 CFR 404.1520(b) and 404.1571 *et
> seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe
> impairments: emphysema/chronic obstructive-pulmonary disease (COPD),
> degenerative disc disease, lumbar spine with chronic low back pain status-post
> lumbar laminectomy, degenerative joint disease, affective disorder and anxiety
> disorder (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or
> combination of impairments that met or medically equaled the severity of one of
> the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d), 404.1525, 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that through

the date last insured, the [plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently. He is able to stand and/or walk for 6 hours per 8-hour day 30 minutes at a time; sit for 6 hours per 8-hour day 30 minutes at a time, but then would need to stand or move around for 2-3 minutes at the workstation to relieve discomfort before returning to a seated position with normal breaks. He can climb ramps and stairs occasionally but should never climb ladders[,] ropes and scaffolds. He can balance, stoop, kneel, crouch and crawl occasionally. He must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness and pulmonary irritants such as fumes, odors, dust, gas and poorly ventilated areas. He must avoid all exposure to hazards such as dangerous heavy moving machinery and unprotected heights. He is able to understand, remember and carry out simple to complex instructions that are not fast-paced. He can maintain concentration and attention for two-hour intervals in an 8-hour workday. He can adapt to minor changes in work process and environment. He is able to interact with the general public, coworkers and supervisors on a superficial basis such that interaction is incidental to the work being performed. He is able to be aware of normal hazards and take appropriate precautions. He is capable of independent travel. Due to medical conditions, symptoms and pain, he would be off task 8% of the work period and absent 1 day a month.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[3]

7. The [plaintiff] was born [in] . . . 1968 and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured. (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in

---

[3] Plaintiff's past relevant work was as a short-order cook, a light, semi-skilled position; a fountain server, fast food worker, convenient store clerk, and assembler, all light, unskilled positions; and a furniture mover, a very heavy, semi-skilled position. (Tr. 31, 100-01).

significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569, 404.1569(a).[4]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 29, 2014, the alleged onset date, through March 31, 2017, the date last insured (20 CFR 404.1520(g)).

(Tr. 18-33).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the

---

[4] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as router (54,000 jobs in the national economy), cafeteria attendant (60,000 jobs in the national economy), and general office clerk (25,000 jobs in the national economy). (Tr. 32, 103).

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson,* 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Relevant Medical Evidence**

1. Dr. Todd Tegtmeier, M.D.- treating primary care physician

The first treatment notes following plaintiff's onset date of disability show plaintiff followed up with Dr. Tegtmeier in October 2014 for anxiety and back pain. Plaintiff complained of back pain and headaches, and he appeared nervous and anxious. (Tr. 538). Dr. Tegtmeier assessed anxiety, sacral back pain, and headache. (Tr. 538-39).

Plaintiff saw Dr. Tegtmeier in February 2015 on a hospitalization follow-up. He had been admitted to the hospital the prior month for acute onset of central upper chest pain. Dr. Tegtmeier reported that plaintiff's chest pain had been asymptomatic following his hospital admission, and a stress Myoview was negative. Dr. Tegtmeier prescribed medication for the sacral back pain; assessed plaintiff's anxiety and depression as overall stable; and diagnosed plaintiff with COPD for which the plan was to continue inhalers, gradually increase walking/exercise as able, and follow up with a pulmonologist as planned/needed. (Tr. 558-59).

Dr. Tegtmeier saw plaintiff for back pain and depression in May 2015. Plaintiff reported he had been working third shift at Speedway for about two weeks and doing well so far. He had

last taken Vicodin 90 days earlier. He felt a "little better" since starting Lexapro, his chest was better, and his back pain was about the same. He also reported that some sweeping and mopping were the most significant physical tasks he was performing. Plaintiff's mood appeared to be mildly anxious, but he did not exhibit a depressed mood. Plaintiff was assessed with sacral back pain, depression, and anxiety. (Tr. 562).

In August 2015, plaintiff reported that he had been robbed two to three weeks earlier while working at Speedway, and he wanted to see a counselor. He had worked about three more days and had wanted to move to dayshift, but he was told there were no openings. He had weaned off the Lexapro as of the prior week. Plaintiff described his back pain as "a little more intense than usual." Dr. Tegtmeier prescribed Wellbutrin. (Tr. 575).

In October 2015, plaintiff reported "feeling on edge" and having "increased back pain." He had not seen a counselor in the past but felt the need talk to someone. His sleep was worse since his pain had increased. His upper lumbar back was tender to palpation. Dr. Tegtmeier assessed major depressive disorder, recurrent episode, moderate; anxiety; and left-sided low back pain without sciatica. (Tr. 579).

In June 2016, Dr. Tegtmeier opined that during an 8-hour workday, plaintiff could sit for 1 hour at a time and a total of 5 hours; he could stand/walk for 1 hour and for 3 hours total; he would need to elevate his legs for at least 1 hour during an 8-hour workday; and he could lift/carry up to 5 pounds for no more than 2 hours in an 8-hour workday. Dr. Tegtmeier also opined that plaintiff would miss more than four days of work each month. (Tr. 600). Dr.

Tegtmeier noted that plaintiff had a history of chronic lower back pain since at least 2008, and he had undergone a lumbar laminectomy and discectomy in January 2012. (Tr. 596-600).

In November 2016, plaintiff complained of unintentional weight loss. He reported to Dr. Tegtmeier that he had been more active. Plaintiff told Dr. Tegtmeier that he had a new puppy and was doing "more walking, moving stuff around, and trying to sit less." Plaintiff had more energy and could walk one-quarter mile. (Tr. 748). The review of systems was positive for back pain but negative for a gait problem. Dr. Tegtmeier suspected that stress in the family was one component to the weight loss. He instructed plaintiff to increase his calorie intake and ordered lab tests. (Tr. 748-49).

Plaintiff saw Dr. Tegtmeier for worsening sacral/lower lumbar back pain in June 2017. He reported that Vicodin was not working well and he wanted to try Percocet, even though Percocet could cause some stomach upset. Plaintiff reported he had been experiencing some ongoing stressors, but he felt that overall he was able to handle stress. Dr. Tegtmeier reported that plaintiff was positive for back pain but negative for gait problems. He discussed the possibility of follow up with a neurosurgeon and prescribed Percocet. (Tr. 757).

In August 2017, plaintiff complained that he had tingling pain at the right S1 area and lower thoracic back pain which radiated down to the right calf. Plaintiff reported that he used a cane at times for balance and due to some right leg weakness. In the past month, he had experienced a warm sensation in the right anterior thigh and a tingling/burning pain in the right posterior leg, with pain and numbness tingling on the left and occasionally radiating down the left leg. He reported shifting positions from left to right while sitting to minimize pain. Plaintiff

8

complained that his pain was getting more frequent and more severe. He was not sleeping well and usually slept in a recliner because his pain was worse in the mid-lower back if he lay flat. On examination of his back, he was able to flex to about 70 degrees, his rotation and lateral flexion were decreased, and he had tenderness to palpation at his left lumbar area. Plaintiff exhibited decreased strength at right foot plantarflexion and dorsiflexion. He was not able to keep his right heel elevated. Dr. Tegtmeier ordered an MRI and referred plaintiff to an orthopedic surgeon. (Tr. 761-62).

An MRI of plaintiff's lumbar spine in September 2017 was "concerning for right subarticular disc extrusion at L4-5 with annular fissure, resulting in right greater than left subarticular effacement and possible descending right L5 nerve root compression." The MRI also showed "[m]oderate right L4 foraminal narrowing," and epidural fibrosis was suspected at this level. (Tr. 764-65).

### 2.  Dr. Bret Ferree, M.D. - consulting orthopedic surgeon

Plaintiff consulted with Dr. Ferree in September 2017 for his lower back pain and right leg pain. Plaintiff stated his pain had begun insidiously about 3 weeks earlier and had steadily increased since then. He rated his back pain as 8/10 and his leg pain, which radiated to mid-calf, as 4-6/10. He reported numbness and tingling in his right leg and weakness in his right leg. Plaintiff reported he was able to sit for no more than 30 minutes and stand for no more than 10 minutes. The pain moderately disrupted his sleep. On physical examination, Dr. Ferree observed that plaintiff "is in obvious pain." His gait was antalgic and he walked with his right hip and knee flexed. He stood with slight lumbar flexion, and his lumbar flexion, extension, and

later bending were "moderately reduced with pain." Plaintiff was tender over his lumbar spine. Straight leg raise on the right on positive. Plaintiff's hip range of motion was pain-free. Dr. Ferree reviewed the lumbar spine MRI images and found they showed "postsurgical changes at L4-L5 with possible small recurrent herniation." He referred plaintiff for possible injections but did not believe plaintiff needed surgery at that time. Dr. Ferree diagnosed degenerative disc disease and possible recurrent disc herniation on the right at L4-L5. (Tr. 712-13).

### 3. Dr. David Beck, M.D. - treating pulmonologist

Plaintiff began treating with pulmonologist Dr. Beck in 2010. Plaintiff reported shortness of breath that began in November 2009. (Tr. 608). He was currently smoking three to four cigarettes per day but had previously smoked a pack a day for the past 25 years. (*Id.*). In June 2017, plaintiff reported his shortness of breath remained relatively stable and he was doing much better with regard to smoking cessation, having had a single cigar over the last six months. Dr. Beck diagnosed plaintiff with respiratory bronchitis interstitial lung disease with mild reduction in forced vital capacity, which was relatively stable, and severe reduction in diffusing capacity; centrilobular emphysema; chest pain - pleuritic, recurrent; insomnia; tobacco abuse in remission; and stabilized weight loss. (Tr. 699-701). In September 2017, plaintiff complained of increasing severe dyspnea on exertion associated with coughing and sputum production. (Tr. 708). Dr. Beck adjusted his medications and prescribed a prednisone taper, a different inhaler since there had been no benefit from Spiriva in the past, and Albuterol/Duoneb on an as needed basis. (Tr. 705-07).

4.    Dr. Martin Fritzhand, M.D. – Consultative Examiner

Dr. Fritzhand performed a consultative examination for disability purposes in November 2015. (Tr. 583-90). Plaintiff complained of back pain that radiated down the right leg. Plaintiff reported he used a cane as an ambulatory aid due to weakness of the right leg and numbness in the right lower limb. He reported he had emphysema and a three-year history of shortness of breath. He stated he could ambulate on level terrain for no more than one-half to one block without associated shortness of breath. Plaintiff told Dr. Fritzhand he was smoking five cigarettes weekly. Dr. Fritzhand reported that previous pulmonary function test results were indicative of mild emphysema. He also reported that plaintiff had undergone a cardiac catheterization to clear a blockage in his artery without placement of a stent. (Tr. 587-88).

On physical examination, plaintiff ambulated with a limping antalgic gait using a cane but could ambulate without the cane. There was no evidence of muscle weakness or sensory abnormalities. Range of motion studies were good. Plaintiff had difficulty forward bending at the waist to 60 degrees. He could stand on either leg and squat without difficulty. Extension of the spine was diminished to 15 degrees. Straight leg raise was diminished to 60 degrees bilaterally. The left calf was one-quarter inch smaller than the right calf. A pulmonary function test administered by Dr. Fritzhand yielded FEV1 values of 2.86 and 2.89, before and after bronchodilators. (Tr. 591-95).

Dr. Fritzhand assessed degenerative joint disease of the lumbar spine, status post laminectomy, with chronic low back pain; COPD; and sinus bradycardia. Dr. Fritzhand opined

that plaintiff could perform a mild amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, and lifting and carrying of heavy objects with an option to alternate from a weight-bearing to sitting position. (Tr. 589-90).

5.     State Agency Review

State agency physician Dr. Elizabeth Das, M.D., reviewed the medical evidence in January 2015 and assessed plaintiff as able to lift and carry 20 pounds occasionally and 10 pounds frequently and able to stand/walk and sit for about 6 hours each in an 8-hour workday. She limited plaintiff to occasionally climbing ramps, stairs, and ladders/ropes/scaffolds, stooping, balancing, crawling and crouching, and she assessed no limit on kneeling. Dr. Das assessed restrictions against concentrated exposure to temperature extremes, wetness and humidity, fumes, odors, dusts, gases, and poor ventilation and exposure to unprotected heights and dangerous machinery. (Tr. 133-34). Dr. Abraham Mikalov, M.D., affirmed Dr. Das's assessment on reconsideration in December 2015 with the added postural limitation that plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 151-53).

E.     **Specific Errors**

On appeal, plaintiff alleges that the ALJ erred by: (1) finding the date last insured to be March 31, 2017, instead of September 30, 2017; (2) failing to consider plaintiff's need to hold onto a cane while performing unskilled light jobs that require the use of two hands; (3) making unfounded assumptions based on an isolated portion of the record to support the decision to deny benefits; (4) improperly weighing the medical source opinions; (5) improperly evaluating

plaintiff's subjective complaints; and (6) relying on improper hypotheticals to the VE to carry her burden at step five of the sequential evaluation process. (Doc. 6).

### 1. The ALJ's date last insured finding

The ALJ found the date last insured was March 31, 2017. (Tr. 18). The ALJ based her finding on plaintiff's earnings record, which she found showed that plaintiff had acquired sufficient quarters of coverage to remain insured through that date. (*Id.*). Plaintiff claims that the date last insured is September 30, 2017. (Doc. 6 at 3, citing Tr. 246-67). Plaintiff asserts that the later date is correct because he performed some brief, part-time work that was not substantial gainful activity but for which he earned extra quarters of coverage. (*Id.* at 3). Plaintiff argues that the ALJ's error was material because medical evidence generated from April 2017 to September 2017 shows that plaintiff experienced worsening shortness of breath and low back and leg pain/numbness during this time period. (*Id.* at 4, citing Tr. 699-707, 761-65, 712-13).

The Commissioner concedes that plaintiff's date last insured is September 30, 2017. (Doc. 11 at 2). Thus, there is no dispute that the ALJ made an error in determining the date last insured was March 31, 2017. However, the Commissioner argues that plaintiff cannot show the ALJ's error was prejudicial. (Doc. 11 at 4). The Commissioner contends that the ALJ considered all the evidence, including the medical evidence and plaintiff's testimony for the six months between March 2017 and September 2017, and "her consideration thereof was reasonable." (Doc. 11 at 4-6).

"Courts have held that the use of an incorrect date last insured may be harmless when the ALJ's denial of disability benefits does not turn on a plaintiff's date last insured, or the plaintiff

13

cannot show prejudice from the use of the incorrect date." *Thomas v. Commr. of Soc. Sec.*, No. 2:18-cv-108, 2019 WL 642679, at *16 (S.D. Ohio Feb. 15, 2019) (Report and Recommendation), *adopted,* 2019 WL 2414675 (S.D. Ohio June 7, 2019) (citing *Ferguson v. Commr. of Soc. Sec.*, No. 3:15-cv-2714, 2017 WL 9473077, at *11 (N.D. Ohio Jan. 25, 2017) (Report and Recommendation) (collecting cases), *adopted,* 2017 WL 561834 (N.D. Ohio Feb. 13, 2017). The party challenging the decision has the burden of establishing that the error was harmful. *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009)).

Plaintiff has shown that the ALJ's erroneous finding that the date last insured was March 31, 2017 was prejudicial. Although the ALJ considered the evidence generated between March 31, 2017 and the correct date last insured of September 30, 2017, the ALJ did not properly evaluate this evidence. For the reasons discussed *infra* in connection with plaintiff's other assignments of error, the ALJ misapplied the Social Security rules and regulations and misconstrued evidence material to the disability determination. This evidence includes testimony and medical evidence that plaintiff's condition worsened and he grew more dependent on a cane before his insured status expired on September 30, 2017, and evidence provided by the VE at the ALJ hearing. Because the ALJ's failure to properly consider this evidence was harmful, plaintiff's claim should be remanded for further administrative proceedings and application of the correct date last insured.

Plaintiff's first assignment of error should be sustained.

14

## 2. The ALJ's Step Four RFC finding

Plaintiff alleges as his second assignment of error that the ALJ erred by finding he retained the functional capacity to do a range of unskilled light work and failing to accommodate his need to use a cane in the RFC finding. (Doc. 6 at 4-6). Plaintiff contends that although the ALJ found that a cane had been prescribed for him, the ALJ failed to account for the need to use a cane in the RFC finding. (Doc. 6 at 5, citing Tr. 27, 103). Plaintiff notes that the ALJ did not find that he could perform any sedentary jobs, which would also be difficult to perform while using a cane. (*Id.*). Plaintiff also argues that the ALJ's restriction to "occasional balance," which equates to one-third of the work day, is inconsistent with her finding that plaintiff could perform the six hours of standing and balancing required for the performance of light work. (*Id.*, citing SSR 83-10, 1983 WL 31251 (1983) and SSR 83-12 (1983)).

The Commissioner argues that the ALJ "reasonably did not conclude that plaintiff needed to use a cane," and her RFC finding is substantially supported. (Doc. 11 at 6-9). The Commissioner asserts that the ALJ properly reviewed the conflicting testimony and medical evidence regarding plaintiff's need for a cane. The Commissioner contends that the ALJ reasonably found that a cane was not medically necessary and could not be considered a limitation on plaintiff's ability to work. The Commissioner alleges that plaintiff did not have a prescription for a cane (Tr. 23); Dr. Fritzhand noted in his 2015 consultative evaluation that plaintiff used a cane but reported he was able to ambulate without a cane (Tr. 588); plaintiff's treating physicians did not report through June 2017 that plaintiff used or required a cane (Tr. 726, 730, 734, 739, 743, 748, 757, 699, 599-600); the state agency reviewing physicians opined

that plaintiff could perform a range of light work and did not opine that he needed an assistive device; and the medical sources made findings that substantially supported the ALJ's decision to not account for the use of a cane in the RFC finding. (Doc. 11 at 8). The Commissioner also contends that the ALJ did not err by finding plaintiff could perform the standing/walking required for light work but that he could balance only occasionally because the two activities are not equivalent. (Doc. 11 at 9, citing SSR 83-10) (stating that "[o]ccasionally" means "occurring from very little up to one-third of the time," and balance is a non-exertional impairment which does not directly affect exertional abilities like standing).

The ALJ is vested with the responsibility for assessing a claimant's functional capacity based on the relevant medical and other evidence. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3), 404.1546. "The ALJ need not decide or discuss uncontested issues, 'the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Delgado v. Commr. of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 2002) (citing *Bencivengo v. Commr. of Soc. Sec.*, 251 F.3d 153 (table) (3d Cir. 2000) (slip op. at 5). ALJs must explain their reasons for including functional restrictions consistent with their assessments in the RFC and must also "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*; SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

The Commissioner suggests that Social Security Ruling 96-9p, 1996 WL 374185 (July 2, 1996)[5] applies here at step four and requires plaintiff to establish "that a hand-held assistive device is medically required" by producing the medical documentation specified in the Ruling. (Doc. 11 at 7, quoting SSR 96-9p, 1996 WL 374185, at *7). However, SSR 96-9p is not relevant to plaintiff's claim because it applies to an ALJ's evaluation of an individual who can perform only sedentary work. *See Abraham v. Commr. of Soc. Sec.*, No. 1:08cv117, 2008 WL 4738333, at *3 (W.D. Mich. Oct. 24, 2008) (citing SSR 96-9p, 1996 WL 374185). Here, the ALJ found that plaintiff could perform a range of light work. (Tr. 22). Thus, plaintiff is required to establish only that a cane was "a *necessary* device for [his] use" to "be considered an exertional limitation that reduced [his] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002) (emphasis added). Plaintiff need not produce the medical documentation set forth in SSR 96-9p to establish that a cane was "medically required."

The ALJ considered plaintiff's testimony and the medical evidence related to his use of a cane in formulating the RFC for a range of light work. (Tr. 27). The ALJ noted that plaintiff testified that "he used a cane on and off until August 2017 when he experienced an increase in pain; subsequently, he started using a cane all of the time because it was hard to get up from a seated position without it." (Tr. 23; *see also* Tr. 27). The ALJ evaluated whether plaintiff's

---

[5] SSR 96-9p is titled, "POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK." It states in pertinent part:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

*Id.*, at *7.

testimony about his need for a cane was consistent with other testimony plaintiff gave about his use of a scooter and with the medical evidence. (Tr. 27). After reviewing inconsistencies that she found in the evidence, the ALJ concluded:

> Nevertheless, because the assistive device is prescribed, the undersigned considered use of a cane in reaching the residual functional capacity and the vocational expert testified that the jobs identified could still be performed. . . .

(Tr. 27).

The ALJ erred in making her findings regarding plaintiff's use of a cane, and in failing to accommodate the need to use a cane in the RFC. First, the ALJ failed to comply with SSR 96-8p when making her findings related to plaintiff's testimony about his use of a cane. The ALJ found that plaintiff's testimony was inconsistent with his testimony about his use of a scooter to shop. (Tr. 27). The ALJ noted that plaintiff testified at the hearing that "he is able to . . . shop using a scooter." (Tr. 21). The ALJ also noted that plaintiff testified at the hearing that he had used a cane intermittently until August 2017, when his pain increased and he started using a cane all the time because it was difficult to get up from a seated position without it. (Tr. 27). She stated that "[a]lthough claimant reported he has been using a scooter to grocery shop since his alleged onset date, this in inconsistent with his testimony during the hearing that he was using a cane off and on until August 2017 when he began to use it regularly." (*Id.*). The ALJ did not explain why she found plaintiff's testimony on his use of a cane to be inconsistent with his testimony about using a scooter, and no such inconsistency is apparent from the record. (*Id.*). Absent any explanation as to why the ALJ found plaintiff's testimony to be inconsistent, the

ALJ's reliance on this alleged inconsistency to discount plaintiff's testimony about his need for a cane was not reasonable.

Further, the ALJ did not accurately characterize plaintiff's testimony on his use of a scooter. The ALJ had the following exchange with plaintiff at the hearing regarding his ability to perform activities of daily living:

> Q  Since 2014 do you have any problems dressing yourself, putting your clothes on?
> A  Sometimes socks and shoes, but not usually.  I try to do what I can.
> Q  Do you take a bath or a shower?
> A  Shower
> Q  Any difficulty taking a shower?
> A  No.
> Q  2014.  You cook anything? . . . .
> A  Yeah.  I can do a few of those things. . . .
> Q  Like what?
> A  You know what I mean?  I mean I can make a sandwich. . . .
> Q  Sweep.
> A  Sweep.  For a minute maybe.
> Q  What about vacuum. . . .
> A  I haven't tried. . . .
> Q  Wash dishes or load the dishwasher?
> A  I have washed dishes before. . . .
> Q  Not for a long period of time?
> A  Exactly. . . .
> Q  Okay.
> A  I try.
> Q  What about shopping for food, clothes, personal items?
> A  Yeah.  I can probably do that.
> Q  How long?
> A  I mean I get in one of those - -
> Q  Scooters.
> A  Scooters.  Yes, ma'am, because if I'm with my wife that's more than ten, 15 minutes.

(Tr. 92-93).  Plaintiff did not testify that he has been using a scooter to shop *since 2014*.  Thus, to the extent the ALJ found an inconsistency based on plaintiff's testimony that he "has been using

a scooter to grocery shop since his alleged onset date [in 2014]" (Tr. 27), the ALJ's finding is not substantially supported.

In addition, the ALJ failed to comply with SSR 96-8p when making her findings related to whether plaintiff's need for a cane was supported by the medical evidence and should be accommodated in the RFC. (Tr. 27). The ALJ accurately found that the medical records did not report, or include an opinion, that plaintiff needed a cane, and the treating physicians' notes did not mention that plaintiff was using a cane through June 2017. (Tr. 27). Dr. Fritzhand noted in November 2015 that plaintiff did not need a cane for ambulating (although he also reported that plaintiff ambulated "with a limping antalgic gate using a cane as an ambulatory aid"). (Tr. 582-95; *see* Tr. 588). There was no report or mention of plaintiff using a cane or other assistive device in Dr. Tegtmeier and Dr. Beck's treatment notes until August 2017. (Tr. 726, 730, 734, 739, 743, 748, 757, 699). Further, Dr. Tegtmeier did not opine in June 2016 that plaintiff needed an assistive device to ambulate. (Tr. 596-602). Yet, despite noting the lack of references to plaintiff's use of or need for a cane in these medical records, the ALJ found that a cane had been prescribed for plaintiff and she stated that she considered plaintiff's use of a cane in formulating the RFC. (Tr. 27). The ALJ found:

> Nevertheless, *because the assistive device is prescribed, the undersigned considered use of a cane in reaching the residual functional capacity* and the vocational expert testified that the jobs identified could still be performed. Considering the claimant's testimony of limitations in his ability to stand/walk and the opinion of Dr. Tegemeyer [sic] including inconsistencies in the record, it is still reasonable to limit the claimant to a residual functional capacity with a sit/stand alternative, percentage of off task [sic], and unskilled work considering his pain complaints and ongoing prescriptions for pain medication, which might produce some side effects and interfere with more semiskilled work task[s].

(Tr. 27) (emphasis added). The ALJ's assertion that she "considered use of a cane in reaching the residual functional capacity," coupled with her assertion that "the vocational expert testified that the jobs identified could still be performed," indicates that the ALJ found that plaintiff's functional capacity was limited by the need to use a cane. But it is impossible to follow the ALJ's reasoning and to discern how she resolved her findings regarding plaintiff's need for a cane with "inconsistencies in the record." (*Id*.). The ALJ did not comply with her general obligation to explain the reasoning underlying her decision in this instance. *See Keeton v. Comm'r,* 583 F. App'x 515, 528 (6th Cir. 2014) (citing *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196-97 (1947) ("the basis for an agency decision 'must be set forth with such clarity as to be understandable' in order to enable judicial review"); *Hyatt Corp. v. NLRB,* 939 F.2d 361, 367 (6th Cir. 1991) ("the requirement that an agency state its reasons for a decision 'imposes a discipline on the agency which prevents haphazard or arbitrary administrative action'")).

Further, the ALJ's discussion of the record evidence related to plaintiff's use of a cane cannot be reconciled with the ALJ's RFC finding. There is a "fundamental illogic" to the ALJ's apparent determination that plaintiff needed to use a cane to ambulate, but he could still "lift and carry up to 20 pounds occasionally and 10 pounds frequently." *See Love v. Commr. of Soc. Sec.,* 605 F. Supp. 2d 893, 907 (W.D. Mich. 2009). Because the ALJ's findings cannot be reconciled, the ALJ's RFC determination is not supported by substantial evidence.

Plaintiff's second assignment of error should be sustained.

### 3. The ALJ's Step Five Finding

Plaintiff alleges as his sixth assignment of error that the ALJ erred by posing an improper hypothetical to the VE that failed to account for plaintiff's need to use a cane. (Doc. 6 at 10). Plaintiff argues that contrary to the ALJ's finding, the VE did not testify the plaintiff could perform the jobs the VE identified in response to the ALJ's hypothetical if plaintiff were required to use a cane. (Doc. 6 at 5, citing Tr. 103). The Commissioner argues that the ALJ met her burden at step five by relying on the VE's testimony to identify jobs that existed in significant numbers in the national economy that plaintiff could perform despite his credible limitations. (Doc. 11 at 19, citing Tr. 103).

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Commr. of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). However, the ALJ's hypothetical question must include only the alleged limitations of the claimant that the ALJ accepts as credible and that are supported by the evidence. *See Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.") (citing *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994)); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 633 (6th Cir. 2004) ("The ALJ is not obligated to include unsubstantiated complaints and restrictions in his hypothetical questions."). If the ALJ's hypothetical question included the limits that the ALJ reasonably found credible, the ALJ could properly rely on the VE's testimony as substantial

evidence that the plaintiff is able to perform jobs that exist in significant numbers in the national economy. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).

The ALJ posed a hypothetical to the VE that incorporated all the physical restrictions that the ALJ eventually included in the RFC finding: light work with the ability to lift/carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours per 8-hour day and for 30 minutes at a time; sit for 6 hours per 8-hour day and for 30 minutes at a time, "but then would need to stand or move around at the workstation for two to three minutes to relieve discomfort before returning to a seated position"; climb ramps/stairs occasionally, never climb ladders/ropes/scaffolds, and balance, stoop, kneel, and crouch/crawl occasionally; avoid concentrated exposure to extreme heat/cold, humidity, wetness and pulmonary irritants; and avoid all exposure to hazards. (Tr. 22, 101-02). The VE testified that the hypothetical individual with these physical restrictions would be able to perform plaintiff's past work of pool monitor and the unskilled light jobs of router (54,000 nationally), cafeteria attendant (50,000 jobs nationally), and general office clerk (25,000 jobs nationally). (Tr. 103). The ALJ then added the restriction of use of a cane to the hypothetical, and the VE gave additional testimony on the jobs that would be available:

> Q If the individual required the use of a cane to and from the work station while carrying objects in the free hand could the pool monitor[6], router, cafeteria attendant and general office clerk [jobs] be performed?
> A I would have to ask an additional question before I can answer that.
> . . .
> A With regard to the pool monitor was it necessary to have to lift any items like --
> Q The claimant testified that as a pool monitor he didn't do any lifting or carrying, that he was sitting most of the time.

---

[6] The pool monitor position was not past *relevant* work. (Tr. 18, 31).

A  Then in that case the person could perform the pool monitor position.
Q  And if the individual when they were in a seated position needed to elevate their feet under the work station at foot height could that pool monitor [position] still be performed?  Because he testified he's out at the pool side.
A  Yeah?  No.  That would not work for that job.

(Tr. 103-04).  The VE did not testify that the hypothetical individual could perform the light, unskilled jobs he identified - router, cafeteria attendant, and general office clerk - if the hypothetical individual needed to use a cane while walking to and from the work station and carrying objects.  (Tr. 104).  The VE further testified that an individual would "[t]ypically" have to "use two hands to do these jobs."  (Tr. 105).

The ALJ mischaracterized the VE's testimony in her written decision.  The ALJ asserted that the VE testified that an individual who needed to use a cane could still perform "the jobs [the VE] identified" at the ALJ hearing.  (Tr. 27).  This is not accurate.  The VE testified that the only job he discussed that an individual could perform while using a cane was the pool monitor job.  (Tr. 103-04).  The VE did not identify any other jobs existing in the national economy that the hypothetical individual could perform if he needed to use a cane.

The ALJ was not required to include restrictions in the hypothetical to account for plaintiff's use of cane if she found that plaintiff's testimony on the matter was not credible or that his need to use a cane was not supported by the medical evidence.  *See Gant*, 372 F. App'x at 585.  But as discussed *supra*, the ALJ apparently found that plaintiff's need for a cane was supported.  The VE's testimony does not support the ALJ's finding that plaintiff could perform the light unskilled jobs the VE identified if plaintiff had to use a cane to walk to and from the work station.  The ALJ's finding at step five of the sequential evaluation that there are a

24

significant number of jobs in the national economy that plaintiff is able to perform is not substantially supported.

Plaintiff's sixth assignment of error should be sustained.

### 4. Weight to the medical source opinions

Plaintiff alleges as his fourth assignment of error that the ALJ erred in evaluating the medical opinions related to his physical functional limitations. (Doc. 6 at 7-9).

Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Id.* A treating source's medical opinion must be given "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2)[7]; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the regulatory factors set out in § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of

_____

[7] The regulation was in effect until March 27, 2017 and therefore applies to plaintiff's claim filed in 2014. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting SSR 96-2p, 1996 WL 374188, at *4)[8].

In addition, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376 (citing SSR 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of his case, especially "where a claimant knows that his physician has deemed him disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

The ALJ gave Dr. Tegtmeier's opinion "some partial weight." (Tr. 30). She noted he is a treating physician who has had a long treatment relationship with plaintiff. (*Id.*). However, she found his opinion was "not entirely consistent" with some findings made by orthopedic surgeon Dr. Ferree, who Dr. Tegtmeier referred plaintiff to in 2017 for consultation regarding plaintiff's lower back and right leg pain. (*Id.*). Specifically, Dr. Ferree found in 2017 that plaintiff's MRI was "indicative of postsurgical changes at L4-L5 with possible small recurrent herniation, for which he was referred for injection but surgery was not recommended." (*Id.*). In addition, Dr. Ferree noted that plaintiff had full strength, good reflexes, intact sensation to light

---

[8] SSR 96-2p was rescinded effective March 27, 2017, when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. Since plaintiff's claim was filed in 2014, SSR 96-2p applies to this case. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 n.9 (6th Cir. 2018).

touch, and pain-free hip range of motion. (*Id.*, citing Tr. 713). The ALJ also found that restrictions of no more than 30 minutes of stooping, 60 minutes of kneeling, and 30 minutes of crouching in an 8-hour workday assessed by Dr. Tegtmeier were not "not entirely consistent with [Dr. Tegtmeier's] treatment notes." (Tr. 30). She found that he did not opine that plaintiff needed an assistive device to ambulate, and his treatment notes did not mention or report that plaintiff used an assistive device or needed to elevate his legs; Dr. Tegtmeier found no "CVAT [Costovertebral Angle Tenderness] bilaterally" on examination of plaintiff's back "[s]ubsequent to his opinion of August 18, 2016"; his treatment notes reflect that plaintiff reported improvement in his condition in November 2016; and Dr. Tegtmeier reported in June 2017 that plaintiff was negative for gait problems but positive for back pain, plaintiff requested Percocet even though it could sometimes cause stomach upset, and plaintiff's behavior was normal and he did not exhibit a depressed mood. (*Id.*).

The ALJ erred in applying the treating physician rule to Dr. Tegtmeier's opinion. First, the ALJ did not properly consider whether Dr. Tegtmeier's opinion was entitled to "controlling" weight under the first prong of the analysis, i.e., whether the opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2). The ALJ did not explain the inconsistencies she found between the restrictions Dr. Tegtmeier assessed and his treatment notes. (Tr. 30). For instance, the ALJ noted that Dr. Tegtmeier did not opine in his June 2016 assessment that plaintiff needed to use a cane, which appears to be *consistent* with the lack of any references to plaintiff's use of a cane in Dr. Tegtmeier's treatment notes prior to August 2017. Further, the treatment notes reflect that plaintiff asked Dr. Tegtmeier

if he could try Percocet for "worsening sacral/lower lumbar back pain" in June 2017, even

though it "can cause some stomach upset," because "Vicodin [was] not working well." (Tr.

757). The ALJ did not explain why plaintiff's willingness to try a new medication to control his

back pain, despite the possibility of suffering an unpleasant side effect, was inconsistent with Dr.

Tegtmeier's opinion. Similarly, the ALJ did not explain why Dr. Tegtmeier's June 2017

findings on physical examination that plaintiff's behavior was "normal" and he did not exhibit a

depressed mood (though his "mood appear[ed] anxious") was inconsistent with Dr. Tegtmeier's

assessment of physical restrictions in June 2016. (Tr. 30, citing Tr. 757).

The ALJ also erred in applying the first prong of the "controlling" weight analysis by

considering only normal findings made by Dr. Tegtmeier and ignoring the treating physician's

abnormal findings. For example, the ALJ noted plaintiff's report of increased activity and

energy levels in November 2016 (Tr. 748) and "no [findings of] CVAT bilaterally" after August

2016, but the ALJ did not discuss abnormal findings Dr. Tegtmeier made in August 2017. (Tr.

761-62 - flexion to about 70 degrees, decreased rotation and lateral flexion, tenderness to

palpation at the left lumbar area, decreased right foot strength, and inability to keep his right heel

elevated). The ALJ also overlooked Dr. Tegtmeier's report in August 2017 that plaintiff "[u]ses

cane at times for balance and since [right] leg seems somewhat weak." (Tr. 761). Instead, the

ALJ discounted Dr. Tegtmeier's opinion based in part on her erroneous finding that his treatment

"notes include no report or mention of the claimant's use of a cane. . ." (Tr. 30).

The ALJ also erred in applying the second prong of the "controlling" weight analysis;

i.e., whether Dr. Tegtmeier's opinion was "not inconsistent with the other substantial evidence in

[the] case record[.]" *See* 20 C.F.R. § 404.1527(c)(2). The ALJ limited her review of the other evidence to the September 2017 treatment notes of Dr. Ferree, who saw plaintiff on referral from Dr. Tegtmeier. (Tr. 30, citing Tr. 713). However, rather than support the ALJ's finding under § 404.1527(c)(2), Dr. Ferree's findings appear to be consistent with Dr. Tegtmeier's assessment. In finding otherwise, the ALJ considered only the normal findings Dr. Ferree made and did not mention his findings that plaintiff was "in obvious pain;" he had an antalgic gait and walked with his right hip and knee flexed; he stood with slight lumbar flexion; his lumbar flexion, extension and lateral bending were "moderately reduced with pain"; and plaintiff's straight leg raise test was positive on the right. (Tr. 30, citing Tr. 713; *see* Tr. 712-13). Further, Dr. Ferree interpreted the September 2017 MRI results as showing a "possible small recurrent herniation" and diagnosed a "possible recurrent disc herniation right L4-L5" (Tr. 713), which the ALJ inexplicably found was "inconsistent" with Dr. Tegtmeier's assessment. (Tr. 30). The ALJ did not rely on any other evidence in determining that Dr. Tegtmeier's assessment was inconsistent with the other evidence of record.

The ALJ did not comply with 20 C.F.R. § 404.1527(c)(2) by properly evaluating whether Dr. Tegtmeier's opinion was entitled to "controlling" weight. The ALJ further erred by failing to evaluate Dr. Tegtmeier's opinion in accordance with the regulatory factors under § 404.1527(c)(2)-(6). The ALJ did not provide "good reasons" for giving Dr. Tegtmeier's opinion "some partial weight." (Tr. 30). Although the ALJ admittedly had no factual basis for doing so, the ALJ questioned whether Dr. Tegtmeier was motivated by sympathy for plaintiff, or felt pressured by plaintiff, to provide an opinion that was not medically supported. The ALJ stated:

The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's request and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 30-31). The ALJ's speculation as to a doctor's possible motives for rendering a medical opinion is unsupported and is an impermissible ground for rejecting Dr. Tegtmeier's opinion.

The ALJ's finding that Dr. Tegtmeier's opinion is entitled to "some partial weight" is not substantially supported by the evidence of record. Plaintiff's fourth assignment of error should be sustained for this reason.

### 5. Third and fifth assignments of error

Plaintiff alleges as his third and fifth assignments of error that the ALJ made unfounded assumptions based on an isolated portion of the record to support her decision, and the ALJ erred by improperly evaluating plaintiff's subjective complaints.[9] (Doc. 6 at 6-7, 9-10). Resolution of these issues may be impacted by the ALJ's reevaluation of the medical and vocational evidence on remand. Accordingly, it is not necessary to address these alleged errors at this time.

### III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to

---

[9] The Court has addressed plaintiff's allegation that the ALJ improperly speculated about Dr. Tegtmeier's possible motives in connection with plaintiff's fourth assignment of error.

benefits as of his alleged onset date. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be remanded for further proceedings, including reevaluation of plaintiff's claim through the date last insured of September 30, 2017, reevaluation of the opinions of the treating physician and the other medical sources of record, and additional vocational and other testimony as warranted, consistent with this decision.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 2/20/2020

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

TIMOTHY SCALES,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:19-cv-003

Barrett, J

Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).